STATE OF NORTH CAROLINA v. GORDON MICHAEL MARLOW

No. 497A91

(Filed 30 July 1993)

1. **Criminal Law § 129 (NCI4th)— plea bargain—not approved by judge—withdrawal by State—no error**

   A first-degree murder defendant's federal and state due process rights were not violated when the state rejected his pleas of guilty to second-degree murder and other offenses where the trial judge indicated that he could not accept the codefendant's plea to first-degree murder based on felony murder absent a finding of no aggravating circumstances, the State indicated that the arrangement was a package, and the court rejected the pleas from defendant and the codefendant. The prosecutor may rescind his offer of a proposed plea arrangement at any time before it is consummated by actual entry of the guilty plea and the acceptance and approval of the proposed sentence by the trial judge. The proposed agreement here had no effect as a matter of law because it had not been approved by the trial judge. Furthermore, defendant did not rely to his detriment on the proposed agreement by taking a polygraph examination because the examination was inconclusive on questions concerning whether he was the person who shot the victim and the State contends that at no point did it intend to use the results of the polygraph examination against defendant or as a part of the proposed agreement.

   **Am Jur 2d, Criminal Law §§ 481 et seq.**

   **Rights of prosecutor to withdraw from plea bargain prior to entry of plea. 16 ALR4th 1089.**

2. **Evidence and Witnesses § 1154 (NCI4th)— murder—testimony regarding statements of codefendant—hearsay—coconspirator exception—not applicable—admission not prejudicial**

   There was no prejudice in a murder prosecution from the admission of testimony regarding statements made by a codefendant where the conversations between the witness and the codefendant occurred after the termination of the conspiracy, the statements were neither made during the conspiracy nor in furtherance of it and did not fall within the coconspirator's exception to the hearsay rule, and any error

was harmless in light of the overwhelming evidence against defendant.

**Am Jur 2d, Homicide § 345.**

**Admissibility of statements of coconspirators made after termination of conspiracy and outside accused's presence. 4 ALR3d 671.**

3. **Criminal Law § 113 (NCI4th)— murder—discovery—statements not furnished—no prejudice**

There was no prejudice in a murder, robbery, and burglary prosecution in the State's failure to divulge defendant's statements to people other than law enforcement officers as directed by the court because the statements were never introduced into evidence, no attempt was made to offer the statements into evidence, and the only reference was by the prosecutor in his opening statement. Assuming error, there was no reasonable possibility of a different result had the error not been committed in light of the strong substantive evidence against defendant.

**Am Jur 2d, Depositions and Discovery §§ 426, 427.**

4. **Evidence and Witnesses § 2051 (NCI4th)— murder—testimony as reaction of another—instantaneous conclusion of the mind**

The trial court did not err in a prosecution for murder, robbery, and burglary by allowing a witness to testify regarding another person's state of mind when the trailer in which the killing occurred was pointed out. The testimony described an instantaneous conclusion of the mind, the equivalent of which was that the person was astonished or perplexed, and was admissible under N.C.G.S. § 8C-1, Rule 701.

**Am Jur 2d, Expert and Opinion Evidence §§ 10, 11.**

5. **Evidence and Witnesses § 3161 (NCI4th)— murder—testimony regarding statement of third party—corroborative**

The trial court did not err in a prosecution for murder, robbery, and burglary by allowing a witness to testify that, when he and Horton had arrived at a codefendant's house, Horton had asked the codefendant if he murdered someone. This testimony was admissible to corroborate the prior testimony of John Horton as well as that of Tammy Horton.

**Am Jur 2d, Witnesses §§ 1001-1005.**

**6. Evidence and Witnesses § 2807 (NCI4th) — murder — leading on direct examination — no abuse of discretion**

There was no abuse of discretion in a prosecution for murder, robbery, and burglary where the prosecutor was allowed to lead a witness on direct examination because the testimony related to equivalent testimony that was introduced earlier in the trial. A ruling on the admissibility of a leading question is in the sound discretion of the trial court and, assuming that the prosecutor here asked a leading question, defendant has failed to establish abuse of discretion. N.C.G.S. § 8C-1, Rule 611(c).

**Am Jur 2d, Witnesses §§ 752-756.**

**7. Criminal Law § 508 (NCI4th) — murder — mistrial denied — no abuse of discretion**

There was no abuse of discretion in denying defendant's motion for a mistrial in a prosecution for murder, robbery, and burglary where defendant's motion was based upon allegations that verbal and nonverbal hearsay of a coconspirator was admitted against defendant after the conspiracy had ended. It could not be said that the trial court's ruling could not have been the result of a rational decision and defendant therefore failed to show abuse of discretion.

**Am Jur 2d, Trial §§ 1706 et seq.**

**8. Evidence and Witnesses § 3191 (NCI4th) — murder — statement of State's witness — read by law enforcement officers**

There was no plain error in a prosecution for murder, robbery, and burglary in not requiring someone other than the law enforcement officers to whom statements were given to read the statements to the jury for purposes of corroboration. Moreover, assuming error, the jury would not have reached a different result had the statements been read by someone else.

**Am Jur 2d, Witnesses §§ 1001 et seq.**

**9. Criminal Law § 329 (NCI4th) — murder — severance of defendants on morning of trial — no abuse of discretion**

There was no abuse of discretion in a prosecution for murder, robbery, and burglary in granting the State's motion to sever defendant's trial from that of his codefendant on the morning of the trial. The State would not have been able

**STATE v. MARLOW**

[334 N.C. 273 (1993)]

to introduce certain evidence if the two defendants were tried together and, had the cases remained joined, further delays would have been inevitable.

**Am Jur 2d, Trial §§ 157 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence upon defendant's conviction of first-degree murder entered by Bowen, J., at the 13 May 1991 Criminal Session of Superior Court, Johnston County. Defendant's motion to bypass the Court of Appeals as to his convictions of conspiracy to commit second-degree burglary, first-degree burglary, and robbery with a dangerous weapon was allowed by this Court on 30 June 1992. Heard in the Supreme Court 10 May 1993.

*Michael F. Easley, Attorney General, by G. Patrick Murphy and John H. Watters, Special Deputy Attorneys General, for the State.*

*Thomas H. Eagen for defendant-appellant.*

MEYER, Justice.

On 3 July 1989, defendant was indicted for first-degree murder, robbery with a dangerous weapon, first-degree burglary, and conspiracy to commit burglary. Defendant was tried capitally in the Superior Court, Johnston County, in May 1991 and was found guilty of all charges. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment. In accordance with the jury's recommendation, the trial court sentenced defendant to life imprisonment for murder and imposed consecutive sentences of three years for conspiracy to commit second-degree burglary, fifteen years for first-degree burglary, and fourteen years for robbery with a dangerous weapon.

On appeal, defendant brings forward numerous assignments of error. After a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial free of prejudicial error, and we therefore affirm his convictions and sentences.

Evidence presented at defendant's trial shows the following. On 1 May 1989, the victim, Leland Mac Grice, and his wife, Ruby Grice, were living in a mobile home off of rural paved road 1934 north of Selma, North Carolina. On the night of 1 May 1989, severe

storm warnings had been broadcast for the area. Because Mrs. Grice was afraid of stormy weather, she left the mobile home at approximately 8:20 p.m. and went to the residence of her daughter, Carol Daniels, less than a mile down rural paved road 1934.

At approximately 11:20 p.m., Mrs. Grice left her daughter's house and drove home. Upon arriving at her mobile home, Mrs. Grice entered through the back door and found papers and contents of drawers and cabinets scattered about the floor. The television was on, and the sound was turned up. In the living room, Mrs. Grice found her husband face down on the floor with a bullet hole in his head. A .22-caliber shell casing was on the floor at his right side, and his wallet was lying on his back. Mrs. Grice called her daughters, Mrs. Daniels and Sherry Hicks, who arrived within minutes.

Detective Tommy Beasley of the Johnston County Sheriff's Department was on duty on 1 May 1989 and responded to a call to the Grice residence. Upon arriving at the scene, Beasley was told by rescue squad personnel that the victim had no vital signs.

Dr. Thomas B. Clark, the medical examiner, testified that an autopsy of the victim revealed a one-inch abrasion on his forehead and a gunshot wound behind his left ear, five and one-half inches from the top of his head and three inches to the left of the posterior midline. The wound track proceeded left to right. The projectile entered the left occipital bone and lodged in the soft tissue behind the jaw bone on the right side. Dr. Clark opined that the cause of death was the hemorrhaging along the wound track caused by the bullet.

Detective Beasley received information that John Horton could help in the Grice homicide and met with Horton on 18 June 1989 at the home of Horton's sister, Tammy Horton. Beasley advised Horton that he was a detective with the sheriff's department and informed him that he needed to talk with him. At this point, Horton said that he was ready to talk. Horton then gave Beasley a statement of the events of 1 May 1989.

John Horton testified at trial, in keeping with his statement to Detective Beasley, that on 1 May 1989, he lived with his girlfriend, Annette Cooper; his sister, Tammy Horton; and her boyfriend, Tommy Ray. Horton stated that at approximately 6:30 p.m. on the night in question, Franklin Dwayne Howell and defendant,

Gordon Michael Marlow, came by Horton's mobile home in Howell's truck. Howell asked Horton if he would "drive for him later that night." Horton asked Howell why he wanted him to drive, but Howell gave no reason. Horton then told Howell that he would drive for him that night.

Around 9:00 p.m., Howell and defendant came back to Horton's mobile home, and Horton went outside and spoke with them. Howell again asked Horton to drive. Horton testified that he could tell that Howell and defendant were "doing lacquer thinner" because Horton could smell it. Horton agreed to drive and went back in the mobile home to dress. Horton testified that he assumed Howell and defendant wanted him to drive so that they could sniff lacquer thinner.

Horton testified that he, Howell, and defendant got into Howell's pickup truck with Howell driving and left the mobile home. Horton noted that Howell's .22-caliber bolt-action rifle was in the cab. Horton had seen and fired the gun previously. Horton stated that Howell wore camouflage clothing and that defendant was dressed in black pants and a black shirt. The three men rode around for approximately thirty to forty-five minutes. During this time, Howell and defendant talked about "where they could find easy money." Howell eventually asked Horton to drive. Horton testified that Howell went to the end of a dirt road near what he later learned was the Grice residence. Howell and defendant, who had the rifle with him, got into the back of the truck.

Horton stated that Howell spoke to him through the sliding rear window of the cab and told him to drive slowly down the dirt road because he and defendant were going to jump out. Howell also told Horton that after he and defendant jumped out, Horton was to circle the dirt road twice and then they would jump back into the rear of the truck. Howell further told Horton that if Horton did not see them the second time around, he was to go down rural paved road 1934 to a red barn where they would meet him.

Horton testified that he slowly proceeded down the dirt road adjacent to the Grice residence and that Howell and defendant jumped out. As they did so, Horton heard one of them say, "Let's get it over with." As the two men ran in the direction of the Grice residence, Horton stated that Howell had something tucked under his arm and defendant had the rifle.

Horton stated that he drove down the dirt road for approximately one and one-half miles until it intersected with a paved road. He then turned left on the paved road and looped back around to the start of the dirt road at the intersection next to the Grice residence. Horton testified that he did not see anyone, and therefore he looped around again. On his second time around, Horton saw defendant running across the field with the rifle. Defendant jumped into the back of the truck and instructed Horton to turn around and go back to the end of the dirt road and turn left on rural paved road 1934. Horton stated that he followed defendant's instructions. When he got to the barn between the Grice and Daniels residences, defendant screamed, "slow down." At that point, Howell jumped into the back of the truck. Horton proceeded down the road until it intersected Highway 39. Howell and defendant then got back into the cab.

Horton testified that once defendant and Howell were inside the cab, Howell asked, "who reloaded it." Defendant responded that he had. Horton stated that as he drove back to his mobile home, Howell and defendant were "joking, carrying on." Once back at Horton's home, defendant "pulled out a black bag" and threw it into the glove compartment. Horton testified that the bag sounded like it had change in it. As Horton walked around the truck, he saw a duffel bag with a tape player inside, which was later identified as belonging to the Grices. Horton stated that he then went into the mobile home and went to bed. He testified that he did not know anything about the Grice murder until he heard the news the following morning.

Additional facts will be set forth as necessary with respect to the various issues.

[1] By his first assignment of error, defendant contends that the trial court violated his federal and state due process rights in rejecting his pleas of guilty to second-degree murder and other offenses because his pleas had been entered and were binding upon the court. Defendant further alleges that, in reliance upon a plea agreement, he submitted to a polygraph examination to his detriment and was thus prejudiced by this violation. We do not agree.

On 13 March 1990, with Judge Wiley F. Bowen presiding, the State called the cases of defendant and his codefendant, Franklin Howell. Counsel for defendant Marlow stated that "defendant has

authorized me to tender in his behalf a plea of guilty to second degree murder," as well as a plea of guilty to first-degree burglary, robbery with a dangerous weapon, and felonious conspiracy to commit burglary. Howell's defense attorney then entered his pleas, among which was a plea of guilty to first-degree murder under the felony-murder theory. Judge Bowen stated that he could not accept a plea from Howell to first-degree murder absent a finding that the State had no evidence of any aggravating circumstance. The district attorney then stated that "this proposed plea arrangement is a package, as far as I am concerned, and is contingent the one upon the other." Judge Bowen then rejected the pleas from both defendant and Howell.

On 3 May 1991, Judge Robert H. Hobgood heard defendant's motion to enforce plea agreement. After hearing arguments from both sides, Judge Hobgood denied defendant's motion and entered a lengthy order containing extensive findings of fact and conclusions of law. The trial court concluded, as a matter of law, that "[t]he District Attorney did have discretionary authority to enter into negotiated pleas among multiple defendants in package deals."

In *Mabry v. Johnson*, 467 U.S. 504, 81 L. Ed. 2d 437 (1984), the United States Supreme Court held that the federal Constitution does not preclude the prosecution from withdrawing a plea agreement once it has been accepted by the defendant. The Court noted that "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Id.* at 507, 81 L. Ed. 2d at 442.

N.C.G.S. § 15A-1023(b) provides that the trial court must first approve a recommended sentence under a plea agreement proposed by the State before it can become effective. In regard to N.C.G.S. § 15A-1023(b), this Court held in *State v. Collins*, 300 N.C. 142, 265 S.E.2d 172 (1980), that "the prosecutor ha[s] no authority to bind the State to the dispensation of a particular sentence in defendant's case until the trial judge ha[s] approved of the proposed sentence." *Collins*, 300 N.C. at 150, 265 S.E.2d at 176-77. Therefore, the prosecutor may rescind his offer of a proposed plea arrangement at any time before it is consummated by *actual entry of the guilty plea* and the acceptance and approval of the proposed sentence by the trial judge.

STATE v. MARLOW

[334 N.C. 273 (1993)]

In the case at bar, we conclude that defendant tendered a guilty plea which was not accepted and approved by the trial judge. The prosecutor withdrew the offers to both defendants prior to actual entry of the pleas and approval by the court. Furthermore, we conclude that defendant did not rely to his detriment on the proposed agreement. The polygraph examination transpired 1 December 1989. During the examination, defendant was inconclusive on the questions directed to him as to whether he was in fact the person who shot Mr. Grice. The State argues that at no point did it intend to use the results of the polygraph examination against defendant or as part of the proposed agreement. We conclude that there was no detrimental reliance by defendant in taking the polygraph examination.

Furthermore, because the trial court in the case *sub judice* did not approve the recommended sentence, we also reject defendant's state constitutional claim. As noted earlier, a plea agreement involving a sentence recommendation by the State must first have judicial approval pursuant to N.C.G.S. § 15A-1023(b) before it is enforceable. The alleged plea agreement in the present case involved a sentence recommendation that defendant enter pleas of guilty to the felonies of second-degree murder, first-degree burglary, robbery with a dangerous weapon, and conspiracy to commit second-degree burglary and that defendant receive two, concurrent life sentences. Thus, the proposed agreement between the defendant and the State had no effect as a matter of law because it had not been approved by the trial judge.

[2] By his next assignment of error, defendant contends that the trial court committed prejudicial error by admitting certain evidence during the testimony of State's witness John Horton. Specifically, at trial, the State called Horton, who testified, over objection, to two conversations that he had on 2 May 1989 with codefendant Franklin Howell in the presence of Tommy Ray. In response to the prosecutor's question, "[D]id you have a conversation with [Howell]?" Horton testified, "I asked him, did him and [defendant] have anything to do with the death of Mr. Grice." In response to the prosecutor's question, "Don't say anything he said. As a result of any answer he gave you, did you make any other further comments to him?" Horton responded, "I told him the best thing to do is not to come back around. To stay away." Horton then testified, "Well, right before we left, [Howell] come out with that

particular tape player and a black one and tried to give it to me and Tommy."

Horton then went on to testify that he saw Howell later that same afternoon, again with Tommy Ray present but in the absence of defendant, and Horton asked Howell, "did he kill [Mr. Grice]." In response to the prosecutor's next question, "Don't tell me what he said. As a result of him saying—making—. Did he make any response to you, but don't tell me what it was, yes or no, did he answer that question?" Horton answered, "Yes." Then the prosecutor asked, "And as a result of that, did you respond anything to him?" and Horton testified, "Again, I told him to leave and not to come back around." Horton then testified that Howell tried to give him a twenty-dollar bill, but he gave it back.

Under Rule 801 of the North Carolina Rules of Evidence, "hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). A statement may be a written or oral assertion or nonverbal conduct intended by the declarant as an assertion. N.C.G.S. § 8C-1, Rule 801(a) (1992).

Clearly, Horton's oral assertion that he told Howell "not to come back around. To stay away," constituted hearsay under Rule 801(a). Furthermore, Howell's actions of attempting to give Horton the tape player and later attempting to give him a twenty-dollar bill were nonverbal assertions also constituting hearsay. *See State v. Satterfield*, 316 N.C. 55, 340 S.E.2d 52 (1986).

An exception to the hearsay rule is that a statement by one conspirator made during the course and in furtherance of the conspiracy is admissible against his coconspirators. N.C.G.S. § 8C-1, Rule 801(d)(E) (1988). In order for the statements or acts of a conspirator to be admissible as evidence against the coconspirator, there must be a showing that " '(1) a conspiracy existed; (2) the acts or declarations were made by a party to it and in pursuance of its objectives; and (3) while it was active, that is, after it was formed and before it ended.' " *State v. Mahaley*, 332 N.C. 583, 593-94, 423 S.E.2d 58, 64 (1992) (quoting *State v. Tilley*, 292 N.C. 132, 138, 232 S.E.2d 433, 438 (1977)).

In this case, the conversations between Horton and Howell occurred after the termination of the conspiracy. The State's proffer

of conspiracy was limited to the time frame beginning on the afternoon of 1 May 1989, when Howell and defendant began coming by Horton's mobile home, and ending when Howell and defendant dropped Horton back at his mobile home around midnight of the same night. The testimony objected to was of conversations occurring in the morning and afternoon of 2 May 1989 between Horton and Howell, while defendant was not present. These statements were neither made during the conspiracy nor in furtherance of it, and therefore do not fall within the coconspirator's exception to the hearsay rule. Thus, the admission of these statements was error. However, we conclude that defendant was not prejudiced by their admission. Had this evidence not been admitted, there is no reasonable possibility that a different result would have been reached. N.C.G.S. § 15A-1443(a) (1988).

The evidence against defendant was overwhelming. During his testimony, Horton described the activities of himself, defendant, and Howell during the evening of 1 May 1989, which included dropping defendant, who carried a rifle, and Howell off near the Grice residence and then picking them back up. Horton then described seeing defendant throw a bag that sounded like it contained coins into the glove compartment of the truck, as well as seeing a duffel bag with a tape player in it in the back of the truck. Moreover, when officers searched Howell's truck two weeks after the murder, they discovered the gun that fired the shell casing found beside Mr. Grice and also found Mrs. Grice's tape player. We find that, in light of the overwhelming evidence against defendant, any error in admitting evidence of Howell's nonverbal conduct in Horton's presence was harmless beyond a reasonable doubt.

[3] In his next assignment of error, defendant contends that the trial court erred in denying his motion to suppress statements allegedly made by defendant because the State had failed to provide such statements in a timely manner pursuant to an order compelling discovery.

On 28 July 1989, defendant filed a motion for discovery, to which the State responded on 2 August 1989. During the course of pretrial litigation, Judge Wiley F. Bowen entered an order, in open court on 9 November 1989, compelling discovery. Section 2 of that order requires that "[i]f any statement by the defendant was made to a person other than a law enforcement officer and if this statement is then known to the State, the State must divulge

the substance of that statement no later than 12:00 noon, on Wednesday prior to the beginning of the week during which this case is calendared for trial." In addition to the discovery previously turned over by the State, supplemental discovery containing oral statements attributable to the defendant was supplied to the defense on 7 May 1991.

During the prosecutor's opening remarks, defendant objected to the mention of the statements attributable to defendant that had been supplied in the supplemental discovery on 7 May 1991. Defendant argued that the State had failed to comply with Judge Bowen's order of 9 November 1989 because the order required the State to divulge such statements no later than the first Wednesday after the State came into possession of such statements prior to any week in which the case had been calendared for trial. Defendant alleges that because the State had his statements since February of 1990 and the case had been calendared for trial numerous times, the State failed to comply with the order compelling discovery by not turning over the statements until 7 May 1991.

The statements in question were never introduced into evidence nor was any attempt ever made to offer them into evidence. The only reference to the statements during the actual trial was by the prosecutor in his opening argument. Assuming *arguendo* that the furnishing of the statements on 7 May 1991 was not in apt time and that the prosecutor's mention of them in his opening statement was error, we conclude that the error, if indeed it was error, was harmless. In light of the strong substantive evidence against defendant, we conclude that there is no reasonable possibility that had the error not been committed, a different result would have been reached. Therefore, this assignment of error is overruled.

[4] By his next assignment of error, defendant contends that the trial court committed prejudicial error by overruling his objections during the testimony of witness Tommy Ray.

Defendant first argues that the trial court erred by overruling his objection to Ray's answer in the following line of testimony:

Q. What happened after you pointed out to [Horton] that was the trailer that Mr. Grice had been killed [in] the night before?

A. He couldn't believe it.

. . . .

Q. When he said that he couldn't believe it, he say [sic] anything
to indicate that to you?

. . . .

A. He just started shaking. He didn't know what was going
on or anything.

In overruling his objection, defendant contends that the trial court
improperly allowed Ray to testify regarding Horton's state of
mind.

Rule 701 of the North Carolina Rules of Evidence deals with
opinion testimony of nonexpert witnesses. The rule provides:

If the witness is not testifying as an expert, his testimony
in the form of opinions or inferences is limited to those opinions
or inferences which are (a) rationally based on the perception
of the witness and (b) helpful to a clear understanding of his
testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1992). The Official Commentary to the
statute specifically states that "[n]othing in the rule would bar
evidence that is commonly referred to as a 'short-hand statement
of fact.'" *Id.* (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina
Evidence* § 125, at 474-76 (2d rev. ed. 1982) ). We have held that
a witness may testify to the instantaneous conclusions of the mind
as to the condition, appearance, or physical or mental state of
persons that are derived from the observance of a variety of facts
presented to the senses at the same time. *State v. Williams*, 319
N.C. 73, 78, 352 S.E.2d 428, 432 (1987).

We conclude that when Ray testified that Horton "couldn't
believe it," he was describing an instantaneous conclusion of the
mind, the equivalent of which was that Horton was astonished
or perplexed. This conclusion was clearly an inference or opinion
rationally based on the perception of the witness and helpful to
a clear understanding of his testimony. Thus, Ray's testimony was
admissible under Rule 701 of the Rules of Evidence.

[5] Defendant next argues that the trial court erred in permitting
Ray to testify that when he and Horton arrived at Howell's house
on 2 May 1989, Horton "[a]sked [Howell] did he murder somebody."
Defendant contends that Ray's testimony was impermissible hear-
say evidence of Howell's admission on behalf of defendant. We
disagree.

It is well settled that a prior consistent statement of a witness is competent for corroborative purposes. *See State v. Ramey*, 318 N.C. 457, 349 S.E.2d 566 (1986); *State v. Elkerson*, 304 N.C. 658, 285 S.E.2d 784 (1982). Prior consistent statements are admissible only when they are, in fact, consistent with the witness' trial testimony. *State v. Stills*, 310 N.C. 410, 415, 312 S.E.2d 443, 447 (1984). In fact, such a statement need not merely relate to specific facts in the witnesses' testimony as long as the prior statement tends to add weight or credibility to such testimony. *State v. McAvoy*, 331 N.C. 583, 592, 417 S.E.2d 489, 495 (1992).

We hold that Ray's testimony corroborated that of the prosecuting witness, John Horton. Horton had previously testified as to the events of 1 and 2 May 1989 as they involved Howell and defendant. Horton stated that after he saw the crime scene tape around the Grice residence, he went to confront Howell. Horton testified that he asked Howell, "did him and [defendant] have anything to do with the death of Mr. Grice."

In addition, Ray's testimony corroborated that of Tammy Horton. Tammy had also previously testified, without objection, that she had asked Howell "whether he was responsible or a part of the death of Mr. Grice." We conclude that Ray's testimony was admissible to corroborate John Horton's, as well as Tammy Horton's, prior testimony and thus overrule this assignment of error.

[6] As a final argument under this assignment of error, defendant contends that the trial court erred by allowing the State improperly to lead Ray during part of his testimony. Specifically, defendant assigns error to the following colloquy:

Q. Did you hear [defendant] say anything about you needing to keep your mouth shut?

[DEFENSE COUNSEL]: Objection, Your Honor. Leading the witness.

A. I did hear that. I can't remember where I heard it at, though.

THE COURT: Overruled.

N.C.G.S. § 8C-1, Rule 611(c) provides, in pertinent part, that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." A ruling on the admissibility of a leading question is in the sound discretion of the trial court, and these rulings are reversible only

for an abuse of discretion. *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790 (1987). Assuming *arguendo* that the prosecutor did ask a leading question of Ray, we conclude that defendant has failed to establish abuse of discretion. Ray's testimony related to equivalent testimony by Tammy Horton and John Horton that was introduced earlier in the trial. Tammy Horton was allowed to testify, without objection, that defendant told Ray "[n]ot to say nothing, that [Ray] could be next." In addition, John Horton testified, without objection, that "[defendant] looked at me and Tommy and told me that if anybody said anything that we would be next." This assignment of error is overruled.

[7] By his next assignment of error, defendant contends that the trial court erred by denying his motion for a mistrial. Defendant's motion was based on his allegation that verbal and nonverbal hearsay of coconspirator Howell was admitted against the defendant after the conspiracy had ended. Defendant further contends that these statements were not revealed to him prior to trial.

The decision to grant or deny a mistrial rests within the sound discretion of the trial court. *State v. Warren*, 327 N.C. 364, 395 S.E.2d 116 (1990). A trial court should grant a mistrial "only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict." *State v. Laws*, 325 N.C. 81, 105, 381 S.E.2d 609, 623, *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 174, *reh'g denied*, --- U.S. ---, 116 L. Ed. 2d 648 (1991). Consequently, a trial court's decision regarding a motion for mistrial will not be disturbed on appeal absent a clear showing that the trial court abused its discretion. *Id.* We are unable to say that the trial judge's ruling could not have been the result of a rational decision and we therefore hold that the defendant has failed to show that the trial court abused its discretion by denying a mistrial.

[8] Defendant next contends that the trial court erred by failing to act *ex mero motu* and require someone, other than the law enforcement officers to whom John Horton gave statements, to relate the statements to the jury for purposes of corroboration. Defendant alleges this perceived error to be of constitutional

magnitude under both the state and federal constitutions but fails to cite a specific section of either constitution.

Because defendant failed to object to the officers' reading of the statements, the objection is deemed waived pursuant to Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure. However, in *State v. Black*, 308 N.C. 736, 303 S.E.2d 804 (1983), we held that the "plain error" rule was applicable to evidentiary matters.

The reading of the prior statements of Horton by the officers was not error. Assuming, however, that it was error, our review of the record fails to convince us that the jury would have reached a different verdict had the statements been read by someone else. This assignment of error is overruled.

[9] In defendant's final assignment of error, he contends that the trial court erred in granting the State's motion to sever defendant's trial from that of his codefendant, Franklin Howell, on the morning of the trial. Defendant argues that he had been preparing for a joint trial in excess of one year and that the motion to sever granted by the trial judge on the day of trial was an abuse of discretion. We disagree.

On 13 February 1990, the district attorney made a motion to join the cases of the defendants, Marlow and Howell, for trial. Judge Bowen heard and granted that motion. On 3 May 1991 at a hearing of motions before Judge Hobgood, the State announced its intention to try the defendants separately, with defendant Marlow being tried first beginning 13 May 1991. At that time, the intention to try the defendants separately and to proceed with defendant Marlow on the 13th was acknowledged by the defense. On 13 May 1991, the State formally made a motion to sever the defendants' cases for trial. Judge Bowen granted the motion.

N.C.G.S. § 15A-927(c)(2) provides in pertinent part that:

The court, on motion of the prosecutor, . . . must deny a joinder for trial or grant a severance of defendants whenever:

a. If before trial, it is found necessary to protect a defendant's right to a speedy trial, or it is found necessary to promote a fair determination of the guilt or innocence of one or more defendants[.]

N.C.G.S. § 15A-927(c)(2) (1988). The disposition of a defendant's motion for a separate trial is a matter governed by the trial court's

discretion. *State v. Rasor*, 319 N.C. 577, 581, 356 S.E.2d 328, 331 (1987). We have long held that the ruling upon a motion for severance will not be disturbed on appeal unless the defendant demonstrates an abuse of judicial discretion that effectively deprived him of a fair trial. *See, e.g.*, N.C.G.S. § 15A-927(c)(2); *State v. Lake*, 305 N.C. 143, 286 S.E.2d 541 (1982); *State v. Porter*, 303 N.C. 680, 281 S.E.2d 377 (1981). We do not find such abuse in the present case.

During the motions hearing on 3 May 1991, the State argued that a severance of the defendants' cases for trial was necessary to avoid potential error under *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), and to avoid further delay in defendant's trial. In *Bruton*, the Supreme Court held that a nontestifying codefendant's extrajudicial confessions implicating the defendant cannot be admitted at their joint trial due to the devastating effect upon the confrontation rights of the other defendant, notwithstanding the trial judge's instructions to the jury that it consider the statements only as against the declarant. *Id.* at 126, 20 L. Ed. 2d at 479. Thus, in the case *sub judice*, the State would not have been able to introduce certain evidence if the two defendants were tried together.

In addition, the State argued that severance would avoid further delay in defendant Marlow's trial. On 26 March 1991, defendant filed a motion for a speedy trial, as well as a motion to dismiss for denial of a speedy trial. At the motions hearing on 3 May 1991, defendant Howell requested and received a continuance. On 13 May 1991, Judge Bowen denied defendant Marlow's motion for a speedy trial and concluded, as a matter of law, that "much of the delay was caused or acquiesced in by the defendant and [was] directly attributable to the number of motions filed by said defendant." Therefore, had the defendants' cases remained joined for trial, further delay would have been inevitable. We conclude that the trial court did not abuse its discretion and there was no error.

In summary, we conclude that defendant received a fair trial free of prejudicial error.

NO ERROR.